**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| SHANNON BADGLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:07CV163 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Shannon Badgley for Disability Insurance Benefits under Title II of the

Social Security Act, 42 U.S.C. §§ 401 et seq., and Supplemental Security Income under Title

XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge

pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28

U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of Plaintiff's Complaint.  (Document

Number 17).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 20).

## Procedural History

On March 18, 2004, plaintiff filed her application for benefits, claiming that she became

unable to work due to her disabling condition on November 15, 2003.  (Tr. 116-18, 50-54).  This

claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated September 19, 2006.  (Tr. 38-42,

48, 56-58, 9-19).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals

Council of the Social Security Administration (SSA), which was denied on September 14, 2007. (Tr. 7, 3-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

A. **ALJ Hearing**

Plaintiff's administrative hearing was held on May 2, 2006. (Tr. 370). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by admitting the exhibits into the record. (Id.).

Plaintiff's attorney indicated that the records were complete. (Tr. 371). Plaintiff's attorney then made an opening statement. (Id.). Plaintiff's attorney stated that plaintiff suffers from osteoporosis,[1] respiratory bronchitis,[2] chronic obstructive pulmonary disease ("COPD"),[3] high blood pressure, acid reflux disease, a peptic ulcer,[4] history of peptic ulcers, history of breast cancer, hyperthyroidism,[5] anxiety, and depression. (Id.). Plaintiff's attorney argued that these

---

[1]Reduction in the quantity of bone or atrophy of skeletal tissue; an age-related disorder characterized by decreased bone mass and loss of normal skeletal microarchitecture, leading to increased susceptibility to fractures. See Stedman's Medical Dictionary, 1391 (28th Ed. 2006).

[2]Inflammation of the mucous membrane of the bronchi. Stedman's at 270.

[3]General term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Stedman's at 554. COPD is comprised primarily of two related diseases-chronic bronchitis and emphysema. See id.

[4]An ulcer of the alimentary mucosa, usually in the stomach, exposed to acid gastric secretion. Stedman's at 2062.

[5]An abnormality of the thyroid gland in which secretion of thyroid hormone is usually increased; characterized by a hypermetabolic state, usually with weight loss. See Stedman's at 928.

impairments render plaintiff totally and permanently disabled and unable to perform past work or any work. (Tr. 371-72).

The ALJ then examined plaintiff, who testified that she was forty-seven years of age, and was married. (Tr. 372). Plaintiff stated that she lived with her husband. (Id.). Plaintiff testified that her husband was sixty-seven years of age and was retired. (Id.). Plaintiff stated that her husband worked as a welder before he retired. (Id.). Plaintiff testified that her husband began drawing disability in 1988 due to back problems. (Id.).

Plaintiff stated that she completed high school and attended two years of college. (Tr. 373). Plaintiff testified that she was five feet tall, and weighed 160 pounds. (Id.). Plaintiff stated that she has never been in the military. (Id.). Plaintiff testified that she has never been in jail. (Id.).

Plaintiff stated that she received food stamps in the amount of $174.00 a month. (Tr. 374). Plaintiff testified that she had no other source of monthly income. (Id.). Plaintiff stated that she had been receiving Medicaid benefits since March 2004. (Id.).

Plaintiff testified that she last worked at a factory for Express Temp, a temporary service. (Id.). The ALJ asked plaintiff when she worked as a telemarketer. (Id.). Plaintiff stated that she worked as a telemarketer for only a week or so in October to November of 2003. (Tr. 375). The ALJ noted that this would have been plaintiff's last job. (Id.). Plaintiff stated that this position only lasted a week or so because she had to take off to take care of her mother and because she hated the position. (Id.). Plaintiff testified that she received one or two paychecks at this position. (Id.). Plaintiff stated that she received minimum wage. (Id.).

Plaintiff testified that her job with Express Temp at the factory ended because she was

unable to perform the position. (Tr. 376). Plaintiff stated that she experienced difficulty breathing and was unable to stand for twelve hours a day. (Id.). Plaintiff testified that she worked at this position for about three months. (Id.).

Plaintiff stated that she worked as a manager at Ryan's Steak House for four years. (Id.). Plaintiff testified that she left this job to work as a manager at Western Sizzler in July of 2003. (Id.). Plaintiff stated that she stopped working at this position in September of 2003 because the business burned down and the owner did not rebuild. (Tr. 377). Plaintiff testified that prior to working as a restaurant manager, she worked as a manager at Holiday Inn for ten years. (Id.).

Plaintiff stated that she was unable to work at a desk job at the time of the hearing because she suffers from dyslexia.[6] (Id.). Plaintiff testified that she was able to work at Holiday Inn and Ryan's Steakhouse despite having dyslexia because her co-workers helped her. (Id.). Plaintiff stated that she has problems with spelling and math due to the dyslexia. (Id.).

Plaintiff testified that she saw a psychiatrist one year prior to the hearing at the request of Medicaid due to problems with anxiety and sleep. (Id.). Plaintiff stated that the psychiatrist told her that her mental problems were caused by her lung disease. (Id.). Plaintiff testified that she only saw the psychiatrist one time and that the psychiatrist did not recommend any additional counseling. (Tr. 378). Plaintiff's attorney indicated that plaintiff's primary care physician

---

[6]Impaired reading ability with a competence level below that expected on the basis of the person's level of intelligence, and in the presence of normal vision, letter recognition, and recognition of the meaning of pictures and objects. Stedman's at 598.

prescribes Xanax[7] and Wellbutrin.[8]  (Id.).

Plaintiff testified that she lives in a modular home with her husband.  (Id.).  Plaintiff stated that she rents the modular home and that her rent is $285.00 a month.  (Tr. 379).  Plaintiff testified that her husband receives $718.00 a month in benefits.  (Id.).  Plaintiff stated that she has lived in the same home for seventeen years.  (Id.).

Plaintiff testified that she earned $24,000 in 1998.  (Id.).  Plaintiff stated that she earned a little less in 1999 because she was attending college and working part-time.  (Id.).  Plaintiff testified that she earned $30,000 in 2000, almost $34,000 in 2001, and $25,000 in 2002.  (Id.).  The ALJ noted that each of these amounts was considerably more than plaintiff's husband's benefits.  (Id.).  Plaintiff testified that at the time of the hearing, her family's income was about one third of what it had previously been.  (Id.).

Plaintiff stated that her most serious medical problem was her breathing.  (Id.).  Plaintiff testified that she is unable to breathe if she walks any distance or performs any type of strenuous work.  (Id.).

Plaintiff stated that she used to smoke.  (Id.).  Plaintiff testified that she quit smoking in December of 2005.  (Id.).  Plaintiff stated that her husband used to smoke.  (Tr. 381).  Plaintiff testified that her husband no longer smokes because he has been diagnosed with level four throat cancer and has started chemotherapy and radiation.  (Id.).

Plaintiff stated that her daughter drove her to the hearing.  (Id.).  Plaintiff testified that she

_____

[7]Xanax is indicated for the management of anxiety disorder.  See Physician's Desk Reference (PDR), 2764 (59th Ed. 2005).

[8]Wellbutrin is an antidepressant indicated for the treatment of depression.  See PDR at 1656.

has a driver's license.  (Id.).  Plaintiff stated that she drives around town in Poplar Bluff, but she does not drive in "the city," which she indicated included Cape Girardeau.  (Id.).

Plaintiff testified that she takes Xanax for anxiety.  (Tr. 382).  Plaintiff stated that she has been taking Ambien[9] to help her sleep since 2004.  (Id.).  Plaintiff testified that she also takes Wellbutrin.  (Id.).  Plaintiff stated that Dr. Dennis Daniels, her former pulmonologist, prescribed these medications.  (Id.).  Plaintiff testified that her current pulmonologist is Dr. Tonya Russell in St. Louis.  (Id.).

Plaintiff stated that she changed pulmonologists because Dr. Daniels had her on a high dosage of Prednisone[10] for over three months and it was not working.  (Id.).  Plaintiff testified that Dr. Russell continued the Xanax, Ambien, and Wellbutrin.  (Id.).  Plaintiff stated that Dr. Donald Piland is her primary care physician.  (Id.).

Plaintiff testified that Dr. Daniels continued the steroids even though they were not effective and caused side effects because he "was new and wanted to cure me."  (Tr. 383).  Plaintiff stated that she shook severely and her blood pressure was stroke level when she was taking the Prednisone.  (Tr. 384).  Plaintiff testified that Dr. Daniels also had her on a higher dosage of Xanax and sleeping pills.  (Id.).  Plaintiff stated that at the time of the hearing, she only took steroids in an inhaler.  (Id.).  Plaintiff testified that Dr. Daniels had her on Prednisone and steroids in an inhaler.  (Id.).  Plaintiff stated that her side effects were so severe when Dr. Daniels was treating her that she considered suicide.  (Id.).  Plaintiff testified that she experienced severe

---

[9]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2980.

[10]Prednisone is a steroid indicated for the treatment of a variety of conditions including skin disorders and breathing disorders.  See PDR at 2966.

mood swings and exhibited violent behavior. (Tr. 385). Plaintiff stated that this occurred in late 2004 and early 2005. (Id.). Plaintiff testified that she had to be slowly weaned off the steroids. (Id.).

Plaintiff stated that she did not consume alcohol. (Id.). Plaintiff testified that she did not use any illegal drugs. (Id.).

Plaintiff stated that she was experiencing increased anxiety at the time of the hearing, mostly due to her husband's health. (Tr. 386). Plaintiff testified that she also experiences anxiety due to her own health problems. (Id.). Plaintiff stated that she has not gotten better since she stopped taking the steroids. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she is receiving Medicaid benefits because she was found to be disabled. (Id.).

Plaintiff stated that she is able to stand for ten to fifteen minutes most of the time. (Id.). Plaintiff testified that she has to sit down and use her inhaler if she tries to sweep the floor or engage in other strenuous tasks because she experiences shortness of breath. (Id.). Plaintiff stated that she is only able to walk to her mailbox and back before she experiences shortness of breath. (Tr. 387). Plaintiff testified that she experiences increased shortness of breath when it is really hot or humid. (Id.).

Plaintiff stated that she had an adult son and daughter who help around the house. (Id.). Plaintiff testified that her daughter sweeps the floors, helps with the laundry, cooks, and washes dishes. (Tr. 388). Plaintiff stated that her son does the yard work. (Id.). Plaintiff testified that her children are aged 25 and 24 and do not live with her. (Id.). Plaintiff stated that if her children did not come over to help, a lot of the household chores would not be performed. (Id.). Plaintiff

testified that her children have been doing most of the grocery shopping since her husband has been sick. (Id.).

Plaintiff stated that most of her past jobs have involved restaurant work. (Id.). Plaintiff testified that she was unable to return to any of her past jobs at the time of the hearing because she was unable to stand for long periods without experiencing shortness of breath. (Id.). Plaintiff stated that she worked for thirty-three years and would like to return to work but she was unable to due to her impairments. (Tr. 389).

The ALJ then re-examined plaintiff, who testified that Dr. Piland is her primary care doctor. (Id.). Plaintiff stated that she also sees Dr. Piland's wife, who is a nurse practitioner. (Id.). Plaintiff testified that she saw the Pilands for five years and then switched doctors. (Id.). Plaintiff stated that she began seeing the Pilands again one year prior to the hearing. (Id.). Plaintiff testified that she switched primary doctors because she has to wait for four to six hours to see Dr. Piland. (Tr. 390).

Plaintiff stated that she believed that her doctors are aware that she applied for disability benefits. (Tr. 390). Plaintiff testified that Dr. Russell mentioned that fact that she had applied for disability benefits. (Id.).

The ALJ indicated that he would request a standard psychological evaluation with testing to obtain further information on plaintiff's anxiety issues. (Id.). The ALJ also requested that plaintiff's attorney attempt to obtain a physical or mental Residual Functional Capacity Assessment from Dr. Piland, the nurse practitioner in his practice, or any of plaintiff's treating physicians. (Id.).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to Poplar Bluff Regional Medical Center on March 1, 2004, with complaints of marked dyspnea. (Tr. 315). Plaintiff was admitted. (Id.). Pulmonary function studies were abnormal. (Id.). Donald S. Piland diagnosed plaintiff with dyspnea, restrictive lung disease,[11] normal cardiac function, and suspected pneumonia. (Id.). Plaintiff was discharged on March 5, 2004, and was instructed to follow-up with Dr. Dennis Daniels on an outpatient basis. (Id.).

Plaintiff presented to Dennis Daniels, M.D. on March 18, 2004, for treatment of dyspnea and dyspnea on exertion. (Tr. 283-84). Plaintiff reported a history of progressive dyspnea over the past two years. (Id.). Dr. Daniels noted that plaintiff had recently been hospitalized and was found to have a severely reduced diffusion capacity and moderate restrictive defect. (Id.). Plaintiff reported that she had smoked a half package to a package of cigarettes a day for twenty years, but she quit smoking two weeks prior. (Id.). Upon physical examination, Dr. Daniels found no crackles or wheezing and no murmur. (Tr. 284). Dr. Daniels' impression was restrictive lung disease and reduced diffusion consistent with interstitial lung disease.[12] (Id.). Dr. Daniels started plaintiff on a trial of Advair.[13] (Id.).

Plaintiff presented to Dr. Daniels for a follow-up on May 4, 2004. (Tr. 281-82). Dr.

[11]Disease where the lungs are bound by scar tissue and unable to expand properly. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 8:141 (1993).

[12]General term for any kind of fibrosing lung disease. More than 100 disease entities are known to be associated with interstitial fibrosis. See Medical Information Systems for Lawyers, § 8:141.

[13]Advair is indicated for the maintenance treatment of airflow obstruction in patients with COPD associated with chronic bronchitis. See PDR at 1391.

Daniels indicated that a cardiac stress test was normal and an echocardiogram revealed a normal ejection fraction and no mention of pulmonary hypertension. (Tr. 281). Plaintiff continued to report severe dyspnea on minimal exertion. (Id.). Dr. Daniels diagnosed plaintiff with interstitial lung disease. (Tr. 282). Dr. Daniels recommended a diagnostic work-up, including a lung biopsy and a bronchoscopy. (Id.).

Chul Kim, M.D. performed a bronchospasm evaluation at the request of the state agency on May 6, 2004. (Tr. 317-38). Dr. Kim diagnosed plaintiff with a mild degree of restrictive lung disease with a minimal change after a bronchodilator. (Tr. 317).

Dr. Daniels performed a bronchoscopy on May 7, 2004. (Tr. 279-80). Plaintiff saw Dr. Daniels on May 12, 2004, at which time he diagnosed plaintiff with interstitial lung disease. (Tr. 278). Dr. Daniels indicated that plaintiff could either start a trial of Prednisone or obtain a lung biopsy and that his preference was the lung biopsy. (Id.). Dr. Daniels scheduled a lung biopsy. (Id.).

Edward M. Bender, M.D. performed a lung biopsy on June 3, 2004. (Tr. 273). Plaintiff presented to Dr. Bender on June 22, 2004, at which time Dr. Bender indicated that the lung biopsy revealed chronic bronchiolitis.[14] (Tr. 267).

Plaintiff presented to the Kneibert Clinic on March 3, 2005, at which time she denied cough, shortness of breath, wheezing, or chest pain. (Tr. 214). Upon physical exam, plaintiff's lungs were clear. (Id.). Kean Griffith, M.D. diagnosed plaintiff with cholelithiasis.[15] (Tr. 215). Dr. Griffith recommended surgery. (Id.).

---

[14]Infection or inflammation of the small airways (bronchioles). See Stedman's at 269.

[15]Presence of concretions in the gallbladder. See Stedman's at 366.

Plaintiff presented to Tonya Russell, M.D. on March 18, 2005. (Tr. 244). Plaintiff's problems were listed as: respiratory bronchiolitis interstitial lung disease, chronic obstructive pulmonary disease, hypertension, history of hysterectomy, history of thyroid nodule, gastroesophageal reflux disease ("GERD"),[16] history of peptic ulcer disease, and history of left breast mass removed in 2003. (Id.). Dr. Russell's impression was: underlying lung disease most consistent with respiratory bronchiolitis interstitial lung disease as well as evidence of mild to moderate obstructive lung disease, continues to remain stable off Prednisone. (Id.). Dr. Russell stated that plaintiff had significant side effects with Prednisone in the past. (Id.). Dr. Russell noted that plaintiff had quit smoking per Dr. Russell's recommendation. (Id.). Dr. Russell indicated that the only therapy for plaintiff's disease was to quit smoking. (Id.). Dr. Russell also recommended that plaintiff's family smoke outside the house. (Id.). Dr. Russell continued plaintiff on her inhalers. (Tr. 245).

Dr. Griffith, M.D. performed a laparoscopic cholecystectomy[17] on March 23, 2005. (Tr. 251). Plaintiff's preoperative diagnosis was gallstones and abdominal pain. (Id.).

Plaintiff presented to the Kneibert Clinic on April 19, 2005, for evaluation of her hypothyroidism. (Tr. 205). Plaintiff denied chest pain, cough, and dyspnea on exertion. (Id.). The impression of Shaun Ross, M.D. was hypothyroidism unspecified. (Tr. 207). Dr. Ross stated that it was unclear if plaintiff had hypothyroidism or if she needed a replacement. (Id.). He

---

[16]A syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. See Stedman's at 556.

[17]Surgical removal of the gallbladder. Stedman's at 365.

discontinued the Synthroid.[18]  (Id.).

Plaintiff presented to the Kneibert Clinic on May 3, 2005.  (Tr. 200).  Dr. Ross noted that plaintiff had a history of thyroid goiter[19] for several years and was on Synthroid to keep the gland from growing.  (Id.).  Plaintiff denied any pain or fullness in her neck.  (Id.).  Plaintiff also denied chest pain, cough, and dyspnea on exertion.  (Id.).  Dr. Ross' impression was history of thyroid nodule.  (Tr. 203).  Dr. Ross recommended that plaintiff undergo testing to rule out cancer.  (Id.).

Plaintiff presented to April Piland, RN, CS, FNP, on June 8, 2005, to get established with a routine family doctor.  (Tr. 228).  Plaintiff reported problems with hot flashes, and pain in her hands and wrists.  (Id.).  Upon examination, plaintiff had diminished breath sounds and faint wheezes in the lungs.  (Id.).  Ms. Piland's assessment was chronic bronchiolitis, emphysema,[20] hypothyroidism, status post gallbladder removal, osteoarthritis, and hot flashes.  (Id.).  Ms. Piland recommended a bone density study and mammogram.  (Id.).  She prescribed Omeprazole[21] and Premarin.[22]  (Id.).

Plaintiff presented to Ms. Piland on August 16, 2005, at which time Ms. Piland noted that plaintiff was doing "fairly well."  (Tr. 226).  Ms. Piland's assessment was chronic bronchiolitis, hot flashes, hypothyroidism, GERD, and allergic rhinitis.  (Id.).

_____

[18]Synthroid is indicated for the treatment of hypothyroidism.  See PDR at 515.

[19]A chronic enlargement of the thyroid gland.  See Stedman's at 824.

[20]Formerly (and still sometimes used) as a synonym for what is now termed COPD.  The term is now restricted to the alveolar damage found in that condition.  Clinical manifestation is breathlessness in exertion.  See Medical Information Systems for Lawyers, § 8:141; Stedman's at 631.

[21]Omeprazole is indicated for the treatment of GERD.  See PDR at 3016.

[22]Premarin is indicated for the treatment of symptoms of menopause.  See PDR at 3368.

Plaintiff presented to Dr. Russell on September 9, 2005, for follow-up. (Tr. 238). Plaintiff reported that she continued to refrain from smoking, although all of her family members smoke in the house. (Id.). Plaintiff indicated that she took Wellbutrin to help control cravings. (Id.). Plaintiff reported that overall her breathing remained stable, although she continued to become dyspneic after walking to the mailbox. (Id.). Dr. Russell's impression was that plaintiff's symptoms remained stable. (Tr. 239). Dr. Russell recommended that plaintiff use Spiriva[23] daily instead of as needed, as well as Advair twice a day. (Id.). She also prescribed Albuterol[24] to use as needed. (Id.).

Plaintiff presented to Patrick LeCorps, M.D. on September 20, 2005, for an evaluation of complaints of joint pain at the request of the state agency. (Tr. 236). Plaintiff reported that she was doing much better and had no pain or inflammation. (Id.). Plaintiff's physical examination of the wrist and ankles was completely normal. (Id.).

Plaintiff presented to Ms. Piland on November 15, 2005 for a follow-up of her chronic bronchiolitis. (Tr. 224). Ms. Piland noted that plaintiff was doing "fairly well," and requested new prescriptions. (Id.). Ms. Piland's assessment was hypothyroidism, chronic bronchiolitis, COPD, osteoarthritis, and allergic rhinitis. (Id.).

Plaintiff presented to Dr. Griffith on December 1, 2005. (Tr. 214). Plaintiff reported that she was currently smoking and that she had been since 2000. (Id.).

---

[23]Spiriva inhaler is indicated for the long-term once-daily maintenance treatment of bronchospasm associated with COPD, including chronic bronchitis and emphysema. See PDR at 1011.

[24]Albuterol is indicated for the relief of bronchospasm in patients with asthma. See PDR at 1180.

In a letter to plaintiff's attorney dated May 4, 2006, Ms. Piland indicated that plaintiff had been a patient in her practice since September of 2001 and that her problems included respiratory bronchiolitis interstitial lung disease, chronic obstructive pulmonary disease, hypertension, history of hysterectomy, history of thyroid nodule, GERD, history of peptic ulcer disease, and history of benign left breast mass removed in 2003. (Tr. 196). Ms. Piland stated that plaintiff had frequent exacerbations of pulmonary infections secondary to her "significant and disabling interstitial lung disease" and chronic obstructive pulmonary disease. (Id.). Ms. Piland indicated that plaintiff also required "frequent bursts of Prednisone therapy for management of this condition." (Id.).

Plaintiff presented to Jonathan D. Rosenboom, Psy. D., clinical psychologist, for a Psychological Consultative Examination at the request of the SSA on June 29, 2006. (Tr. 181-90). Plaintiff complained of anxiety and sleeplessness. (Tr. 182). Plaintiff indicated that her anxiety resulted from the recent diagnosis of her husband with throat cancer. (Id.). Plaintiff reported a history of anxiety beginning in 2003, when she was treated for a lung disease with three months of steroids. (Id.). Plaintiff indicated that the steroid treatment caused her to feel jittery and nervous, disrupted her sleep, and caused her to be physically aggressive. (Id.). Plaintiff was placed on sleep medication, Xanax, and Wellbutrin. (Id.). Plaintiff reported that she started smoking again when her husband was diagnosed with cancer. (Tr. 183). Plaintiff denied that her psychological symptoms affect her ability to work. (Tr. 184). Dr. Rosenboom found plaintiff to be a somewhat irritable, assertive, talkative examinee who appeared to be a reliable historian. (Tr. 184). Dr. Rosenboom diagnosed plaintiff with anxiety disorder, not otherwise

specified and assessed a GAF of 65.[25]  (Tr. 186).  Dr. Rosenboom expressed the opinion that

plaintiff's ability to understand, remember, and carry out instructions was not impaired by her

mental disorder.  (Id.).  He also found that plaintiff's ability to respond appropriately to work

supervisors, co-workers and work stressors was not impaired by her mental disorder.  (Id.).


C.     **Post-Hearing Medical Evidence**

Plaintiff has attached as "Exhibit A" to her brief a letter and records from Dr. Piland.  In

his letter to plaintiff's attorney dated November 22, 2006, Dr. Piland states that plaintiff

underwent pulmonary function studies, which revealed mild to moderate restrictive and

obstructive airway disease along with a marked decrease in diffusion capacity.  Dr. Piland states

that this can "clearly lead to exertional dyspnea and oxygen desaturation with exertion (failing

oxygen levels)."  He further states that plaintiff's arterial blood gasses show that she

hyperventilates to maintain adequate oxygenation.  Dr. Piland provided the reports from the

pulmonary function studies, which were dated October 3, 2006.


**The ALJ's Determination**

The ALJ made the following findings:

1.     The claimant met the disability insured status requirements of the Social Security
       Act on November 15, 2003, the date the claimant stated she became unable to
       work, and continues to meet them through December 2008.

---

[25]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and
mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV),
32 (4th Ed. 1994).

2.      The claimant has not engaged in substantial gainful activity since November 2003.

3.      The medical evidence establishes that the claimant has bronchiolitis and emphysema, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P Regulations No. 4.  The claimant does not have a severe mental impairment.

4.      The claimant's allegations of disabling symptoms precluding all substantial gainful activity are not consistent with the evidence and are not credible for the reasons specified in the body of the decision.

5.      The claimant has the residual functional capacity to perform work except for work that involves frequently lifting over ten pounds or occasionally lifting over twenty pounds.  There are no other exertional or nonexertional limitations (20 CFR 404.1545 and 416.945).

6.      The claimant is able to perform her past relevant work as a telemarketer and is not disabled.

7.      Even assuming arguendo that the claimant could not perform her past relevant work, the claimant has the residual functional capacity to perform a full range of light work (20 CFR 404.1567 and 416.967).

8.      The claimant is 47 years old, which is defined as a younger individual (20 CFR 404.1563 and 416.963).

9.      The claimant has completed 2 years of college education (20 CFR 404.1564 and 416.964).

10.     Considering the claimant's residual functional capacity and vocational factors, the issue of whether the claimant has transferable skills is not critical (20 CFR 404.1568 and 416.968).

11.     Based on Rule 202.20, Table No. 2 of Appendix 2, Subpart P, Regulations No. 4 and considering the claimant's residual functional capacity, age, education, and work experience, she is not disabled.

12.     The claimant is not under a disability, as defined in the Social Security Act and Regulations (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-19).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on March 18, 2004, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(I) and 223 of the Social Security Act and is not eligible for Supplemental Security Income Benefits under Section1614(a)(3)(A) of the Act.

(Tr. 19).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claims

Plaintiff first argues that new evidence from her treating physician reveals that plaintiff's physical impairments meet or equal a listing. Plaintiff next contends that the ALJ erred in determining the credibility of plaintiff's subjective complaints of pain and limitation. Plaintiff finally argues that the ALJ erred in determining plaintiff's residual functional capacity. The undersigned will address plaintiff's claims in turn.

## 1.    New Evidence

Plaintiff argues that new evidence from treating physician Dr. Piland attached to plaintiff's brief establishes that plaintiff's physical impairments meet or equal a listing. Defendant contends that the new evidence does not warrant remand because it is not relevant to the time period for

which benefits were denied.

At issue is a letter and records from Dr. Piland, which plaintiff has attached to her brief as "Exhibit A." In his letter to plaintiff's attorney, dated November 22, 2006, Dr. Piland states that plaintiff underwent pulmonary function studies, which revealed mild to moderate restrictive and obstructive airway disease along with a marked decrease in diffusion capacity. Dr. Piland states that this can "clearly lead to exertional dyspnea and oxygen desaturation with exertion (failing oxygen levels)." He further states that plaintiff's arterial blood gasses show that she hyperventilates to maintain adequate oxygenation. Dr. Piland provided the reports from the pulmonary function studies, which were dated October 3, 2006.

A district court may remand a case to have additional evidence taken "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). "To be considered material, the new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied." Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1997). Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing a sufficient explanation. See Hinchey v. Shalala, 29 F.3d 428, 433 (8th Cir. 1994).

Plaintiff's new evidence consists of a letter from her treating physician dated November 22, 2006, two months after the ALJ issued his decision. (Tr. 9-19). Dr. Piland's opinion is based on testing plaintiff underwent on October 3, 2006, one month after the ALJ's decision. As such, the new evidence addresses plaintiff's condition after the period for which benefits were denied

and is, therefore, not relevant.  Further, plaintiff has not established good cause for her failure to

submit these records prior to the closing of the administrative record, as the Appeals Council did

not issue its decision until September 14, 2007.  Thus, plaintiff has not shown that the new

evidence warrants remand.  As defendant accurately notes, if plaintiff wishes this new evidence to

be considered, she may file a new application for benefits.

**2.      Credibility Assessment**

Plaintiff argues that the ALJ erroneously found her subjective complaints of pain and

limitation not credible.  Defendant contends that the ALJ's credibility determination is supported

by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically

determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not

be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement

agreement between Department of Justice and class action plaintiffs who alleged that the

Secretary of Health and Human Services unlawfully required objective medical evidence to fully

corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective

allegations of pain and limitation, in doing so the ALJ "must make an express credibility

determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the

consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of

the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the

medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141

F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 15). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed the medical evidence and found that it did not support plaintiff's subjective complaints. (Tr. 13-15). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

With regard to plaintiff's breathing impairment, the ALJ first noted that a bronchospasm evaluation performed by Dr. Kim on May 6, 2004, revealed only a mild degree of restrictive lung disease. (Tr. 13, 317). The ALJ next stated that Dr. Russell's records indicate that plaintiff's symptoms were stable with medication. (Tr. 13, 244, 239). The ALJ noted that plaintiff reported to Dr. Griffith at the Kneibert Clinic on December 1, 2005, that she had no shortness of breath, wheezing, abdominal pain, chest pain, peripheral edema, nausea, or indigestion. (Tr. 13,

214). On examination, plaintiff had a regular heart rate and rhythm without abnormal heart sounds, clear lungs, and full range of motion of all of her joints. (Tr. 14, 214). The ALJ found that this examination and plaintiff's denial of symptoms of shortness of breath or wheezing were inconsistent with an inability to perform even light work. (Tr. 14). The ALJ also discussed Ms. Piland's May 4, 2006 letter indicating that plaintiff was disabled. (Tr. 196). The ALJ noted that Ms. Piland's treatment notes indicate that plaintiff was doing fairly well and had clear lungs. The ALJ, therefore, properly concluded that Ms. Piland's opinion was not supported by her own records. (Tr. 14).

Plaintiff reported other impairments, including GERD, hypertension, history of peptic ulcer disease, history of gall bladder surgery, and history of left breast mass removed in 2003. The ALJ found that plaintiff failed to seek regular treatment for these conditions. (Tr. 16). This finding is supported by the record. This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

Further, the ALJ noted that none of plaintiff's treating or examining physicians have imposed any long-term or significant limitations upon plaintiff's functional capacity. (Tr. 16). The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The ALJ next discussed plaintiff's daily activities. (Tr. 15). The ALJ noted that plaintiff indicated in her application that she uses a checkbook, banks, goes to the post office, reads books as a hobby, drives an automobile three to five miles to see her disabled mother twice per week,

and has no problems getting along with her people.  (Tr. 15).  The ALJ found that plaintiff's activities, specifically her driving and leaving her home frequently, were inconsistent with her allegations of disability.  (Tr. 15).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  The ALJ further found that plaintiff's reading as a hobby and her ability to manage her finances were inconsistent with plaintiff's allegation of an inability to work due to dyslexia.  (Tr. 15).

The ALJ pointed out that plaintiff has been non-compliant with treatment recommendations.  Specifically, Dr. Russell has stressed the importance of cigarette smoking cessation to plaintiff's treatment of her lung disease.  (Tr. 244, 238).  In fact, Dr. Russell stated that the only therapy for plaintiff's lung disease was to quit smoking.  (Tr. 244).  The ALJ noted that plaintiff reported in December 2005 that she smoked a half package of cigarettes a day and reported near the time of the hearing that she had started smoking again.  (Tr. 16, 214, 183).  Failure to follow a prescribed course of treatment may detract from a claimant's credibility.  See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).  As such, the ALJ properly found that plaintiff's failure to quit smoking detracted from her credibility.

The ALJ next noted that plaintiff testified that she stopped working at her last non-temporary job when the business burned down.  (Tr. 17, 377).  The ALJ properly noted that the fact that plaintiff left her job for reasons other than her alleged disability detracted from her credibility.

Finally, the ALJ pointed out inconsistencies in the record.  First, the ALJ noted that plaintiff testified at the hearing that she quit smoking six months prior to the hearing and that her husband had recently been diagnosed with cancer.  (Tr. 17).  Plaintiff, however, told the

consultative psychological examiner just one month later that she had started smoking again when her husband was diagnosed with cancer. (Tr. 183). The ALJ found that this discrepancy greatly detracted from plaintiff's credibility in light of the fact that plaintiff's doctor had warned her of the importance of not smoking. (Tr. 17). The ALJ also noted that plaintiff failed to list her job as a telemarketer on a form that instructed her to list all of her jobs in the prior fifteen years, which he found further detracted from her credibility. (Tr. 17).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

**3.** **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining her residual functional capacity. Plaintiff also challenges the ALJ's finding that she had past relevant work as a telemarketer. Defendant argues that the ALJ's residual functional capacity determination is supported by substantial evidence.

The ALJ found that plaintiff had the residual functional capacity to perform work except for work that involves frequently lifting over ten pounds or occasionally lifting over twenty pounds. (Tr. 17). The ALJ stated that this residual functional capacity is supported by the "collective medical records of Doctors Griffith, Russell, and Kim." (Id.). The ALJ thus found

that plaintiff was capable of performing the full range of light work. (Id.).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Plaintiff challenges the weight restrictions contained in the residual functional capacity formulated by the ALJ. Specifically, plaintiff alleges that, although the ALJ found that plaintiff was capable of frequently lifting ten pounds and occasionally lifting twenty pounds, the evidence revealed that plaintiff was restricted to lifting no more than ten pounds. As support for this argument, plaintiff cites to plaintiff' attorney's argument during the administrative hearing that plaintiff was restricted to lifting no more than ten pounds following the removal of a breast cancer mass in 2003. (Tr. 371). Plaintiff further challenges the ALJ's residual functional capacity determination based on her allegations of dyslexia. As support for this claim, plaintiff cites to plaintiff's testimony at the hearing that she was unable to perform a desk job due to dyslexia.

Plaintiff's arguments lack merit. There is no support for plaintiff's attorney's argument

that plaintiff was precluded from lifting more than ten pounds in the medical record.  Although

such a weight restriction may have been imposed immediately following plaintiff's surgery in

2003, there is no indication that this was a permanent restriction.  In fact, there is no evidence in

the record that plaintiff's physicians imposed any weight restrictions.  With regard to plaintiff's

contention that she is unable to perform a desk job due to dyslexia, the ALJ found that plaintiff's

allegations of disabling dyslexia were inconsistent with her hobby of reading and ability to manage

her finances.

The residual functional capacity formulated by the ALJ is supported by substantial

evidence.  The ALJ cited the records of Doctors Griffith, Russell, and Kim in support of his

determination.  Notably, none of plaintiff's physicians imposed any limitations on plaintiff's

functional capacity.  Further, plaintiff testified at the hearing that the only impairment preventing

her from performing a desk job was her dyslexia.

Plaintiff also objects to the ALJ's finding that plaintiff had past relevant work as a

telemarketer, which she could still perform.  Although the ALJ did find that plaintiff could

perform her past relevant work as a telemarketer, he proceeded to step five of the sequential

evaluation and used the medical-vocational guidelines to find that plaintiff could perform other

work existing in significant numbers in the national economy.

Plaintiff suggests that the ALJ was required to obtain testimony from a vocational expert.

"[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ

finds, and the record supports the finding, that the nonexertional impairment does not diminish the

claimant's residual functional capacity to perform the full range of activities listed in the

Guidelines."  Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997).  The ALJ found that plaintiff

was capable of performing the full range of light work.  As such, vocational expert testimony was

not required.  The ALJ properly applied the medical-vocational guidelines to find that plaintiff was capable of performing other work.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this memorandum.

Dated this ___24th___ day of March, 2009.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE